57 F.3d 1082
NOTICE: Federal Circuit Local Rule 47.6(b) states that opinions and orders which are designated as not citable as precedent shall not be employed or cited as precedent. This does not preclude assertion of issues of claim preclusion, issue preclusion, judicial estoppel, law of the case or the like based on a decision of the Court rendered in a nonprecedential opinion or order.
 BAXTER DIAGNOSTICS INC., Plaintiff-Appellant,
v.
PB DIAGNOSTIC SYSTEMS, INC., Defendant-Appellee.
 No. 94-1327.
 United States Court of Appeals, Federal Circuit.
 May 1, 1995.
Rehearing Denied May 26, 1995.
Rehearing Denied; Suggestion for Rehearing In Banc
Declined May 30, 1995.
 
 Before PLAGER, Circuit Judge, COWEN, Senior Circuit Judge, and RADER, Circuit Judge.
 DECISION
 RADER, Circuit Judge.
 
 
 1
 Baxter Diagnostics, Inc. sued PB Diagnostic Systems, Inc. for infringing United States Patent No. 4,417,288. The trial court granted PB summary judgment of noninfringement. Baxter Diagnostics, Inc. v. PB Diagnostic Sys., Inc., No. 92-CV-3170 (N.D.Ill. Mar. 21, 1994) (order). Because PB's method does not literally infringe the '288 patent and the prosecution history of the patent estops Baxter from asserting infringement under the doctrine of equivalents, this court affirms.
 
 DISCUSSION
 The '288 Patent
 
 2
 The '288 patent claims a method of performing an enzyme-linked (ELISA) immunoassay. The assay measures the amount of an analyte in a fluid sample. For example, the assay might measure the amount of a virus in a sample of human blood.
 
 Representative claim 1 recites five steps:
 
 3
 A competitive method for conducting a solid phase enzyme immunoassay of a fluid sample within the interstices of a solid, inert porous medium, said fluid sample containing an unknown level of analyte, the method comprising
 
 
 4
 a. immobilizing a binding material within a finite zone of the interstices of the solid, inert porous medium, said binding material being capable of immunological reaction with said analyte from among the constituents of the fluid sample;
 
 
 5
 b. applying, under binding conditions, to substantially the center of said finite zone, containing said immobilized binding material, a fluid sample containing the analyte for which said binding material is specific, said analyte being applied as a solution so as to permit diffusion thereof within the interstices of a reaction zone of the porous medium;
 
 
 6
 c. applying an enzyme-labeled indicator to substantially the center of said reaction zone, under conditions which allow said indicator and said analyte to compete for binding sites on said immobilized binding material, said indicator, which comprises an enzyme conjugated to a ligand, being immunochemically bound to said immobilized binding material in a amount which can be correlated to the amount of analyte in said reaction zone;
 
 
 7
 d. applying, to substantially the center of said reaction zone a stream of eluting solvent containing a substrate for the enzyme of said enzyme-labeled indicator, the quantity of said eluting solvent being sufficient to effect radial chromatographic separation, within said porous medium, of unbound enzyme-labeled indicator from bound enzyme-labeled indicator within said reaction zone; and
 
 
 8
 e. observing the extent to which the bound enzyme-labeled indicator is present within a delimited area of said reaction zone by measurement of the level of chromophore or fluorophore produced by the action of the bound enzyme-labeled indicator on said substrate, said delimited area of said reaction zone being essentially free of unbound indicator.
 
 
 9
 The first three steps, steps a--c, prepare a reaction zone in a porous medium, such as a glass fiber mat. The user fixes a binding material in the medium. The user next introduces a solution of the fluid sample. Then the user introduces an indicator solution. The indicator responds visibly when it reacts with the binding material. For example, the indicator might fluoresce.
 
 
 10
 The analyte and indicator compete to react with the binding material. Because of this competition, the amount of analyte in the fluid sample determines the amount of indicator that binds. Accordingly, the amount of reacting (fluorescing) indicator shows the amount of analyte in the fluid sample.
 
 
 11
 In the fourth step in the process, step d, the user introduces an eluting solvent to react chemically with the indicator residue that did not react with the binding material. The claim specifies "applying" this solvent "to substantially the center of said reaction zone." The solvent elutes, that is, extracts, unbound indicator and washes it from the reaction zone. This process separates the unbound from the bound indicator. As the solvent washes indicator away from the center of the reaction zone, the method supplies a radial chromatographic array.
 
 
 12
 Finally, in the fifth step of claim 1, step e, the user observes the amount of bound indicator in an area of the reaction zone that has been washed essentially free of unbound indicator. If the indicator fluoresces, the user observes the amount of fluorescence. This indicates the amount of analyte in the fluid sample.
 
 
 13
 The crux of this appeal is the fourth step of claim 1:
 
 
 14
 d. applying, to substantially the center of said reaction zone a stream of eluting solvent containing a substrate for the enzyme of said enzyme-labeled indicator....
 
 
 15
 (Emphasis added.) The parties dispute the meaning of the highlighted "applying" limitation. An examination of the accused process reveals the dispute over this claim language.
 
 The Accused Process
 
 16
 Baxter accuses PB's OPUS ELISA immunoassay kit of infringing the '288 patent. The OPUS kit includes filter paper made of a glass fiber mat with a reaction zone visible through a window. The user introduces the fluid sample and a fluorescent indicator to the reaction zone through the window. The analyte and indicator compete to react with binding material in the reaction zone.
 
 
 17
 PB's OPUS kit also includes a wash solvent for removing unbound indicator from the reaction zone. The user does not introduce the wash solution to the reaction zone through the window, however. Instead, the OPUS kit includes a wash port separate from and to one side of the reaction zone. The user introduces the wash solution to the filter paper through the wash port. The solution then migrates by capillary action across the reaction zone, washing the unbound indicator to the other side. This leaves only bound indicator in the reaction zone, allowing the user to observe the amount of bound indicator, and thus analyte, in the fluid sample.
 
 Procedural History
 
 18
 PB moved for summary judgment of noninfringement, contending that migration across the reaction zone does not meet the "applying" limitation. Baxter responded with affidavits by the inventors and two experts asserting that PB infringed. The trial court granted summary judgment, reasoning that the patent claims
 
 
 19
 require that the wash solution be directly applied, or introduced, at substantially the center of the reaction zone. This is what the claims require. The claims do not cover a method where the wash is applied at a point separate from the reaction zone and migrates from that point to the reaction zone. In such a method, the point of entry to the reaction zone would not be a point substantially at the center, but the perimeter, from where the wash would diffuse to the center.
 
 
 20
 The trial court held that PB did not literally infringe. The trial court further held that Baxter was estopped by the prosecution history from asserting infringement under the doctrine of equivalents:
 
 
 21
 [T]he '288 patent was issued on the strength of the applicants' representation to the Patent Office that the direct application of the wash to the center of the reaction zone distinguished their invention from the prior art.
 
 
 22
 The trial court granted summary judgment of noninfringement. Baxter appeals.
 
 Analysis
 
 23
 When the law entitles the moving party to judgment and no genuine issues of material fact preclude reaching the legal merits, a trial court may grant summary judgment. Fed.R.Civ.P. 56(c). This court reviews the grant of summary judgment de novo. Winner Int'l Corp. v. Wolo Mfg. Corp., 905 F.2d 375, 376, 15 USPQ2d 1076, 1077 (Fed.Cir.1990).
 
 Literal Infringement
 
 24
 Because the parties agree on how PB's OPUS assay method works, this case--like nearly every literal infringement case--reduces to a question of claim construction: Does the limitation "applying, to substantially the center of said reaction zone" include a method which delivers the solvent outside the reaction zone and allows the washing solution to reach the center of the zone by migration? In construing claim language, the court examines the claims, specification, prosecution history, and other evidence about the meaning artisans of ordinary skill would give the claims. See McGill Inc. v. John Zink Co., 736 F.2d 666, 672-75, 221 USPQ 944, 948-50 (Fed.Cir.), cert. denied, 469 U.S. 1037 (1984).
 
 
 25
 At the outset, the claim language itself reveals the importance of the "applying" limitation. Claim 1 specifies "applying" the solvent "to substantially the center of [the] reaction zone." For several reasons, migration across the reaction zone does not satisfy this requirement. First, claiming the precise point of application to the reaction zone--"substantially the center"--would be surplus language if the claims covered migration from a point outside the reaction zone. If the claims included direct delivery of solvent outside the reaction zone, with migration to the zone's center, the claims would merely recite application of sufficient solvent to wash the reaction zone. If this were the case, the claims would not recite an application point. The unambiguous claim language, however, recites an application point. Migration across the reaction zone does not employ application at that point.
 
 
 26
 In addition, step c of claim 1 parallels the activity of step d. In step c, the user also applies a solution, the indicator solution, "to substantially the center" of the reaction zone. Thus, the claims cover a method which applies the solvent in a similar manner and to the same point as the indicator solution. The claims do not cover a method where the indicator is introduced to substantially the center of the reaction zone, but the solvent is introduced to one side and only reaches the reaction zone by migration.
 
 
 27
 A review of the '288 specification discloses language further informing the meaning of the "applying" limitation. The claims and the specifications must use words consistently. ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1580, 6 USPQ2d 1557, 1560 (Fed.Cir.1988) (quoting Autogiro Co. v. United States, 384 F.2d 391, 397, 155 USPQ 697, 702-03 (Ct.Cl.1967)). The '288 specification explains:
 
 
 28
 A stream of a solvent ... is applied to substantially the center of the reaction zone.... As the solvent migrates radially out from the center of the reaction zone, unbound reactants are chromatographically separated from the bound reactants.... Such reactants, if visible, would appear as a ring around the reaction zone....
 
 
 29
 '288 patent, col. 5, lines 54-64 (emphasis added). According to the specification, application to the center of the reaction zone causes migration "radially out from the center of the reaction zone." This radial separation creates a "ring" around the center of the reaction zone. Again this differs from migration across the reaction zone. Migration across the reaction zone would not form "a ring around the reaction zone." Instead, migration across the reaction zone would push unbound indicator to one side. Thus the specification supports the trial court's reading of the claim language.
 
 
 30
 The prosecution history also informs the meaning of the "applying" limitation. See Hormone Research Found., Inc. v. Genentech, Inc., 904 F.2d 1558, 1563, 15 USPQ2d 1039, 1048 (Fed.Cir.1990), cert. dismissed, 499 U.S. 955 (1991). During the prosecution of the '288 patent, the patent examiner rejected the claims as anticipated by U.S. Patent No. 4,258,001 to Pierce et al. (Pierce). The inventors then distinguished their method over Pierce by referring to the "point of application" of the solvent:
 
 
 31
 It is Applicants' position that their claims ... fully distinguish their invention over the Pierce et al. reference. More specifically, the Pierce et al. reference does not contemplate performance of an immunoassay ... in the manner explicitly recited by Applicants' claims. Applicants' claims ... are specific as to the point of application of ... the eluting solvent.
 
 
 32
 ....
 
 
 33
 ... Pierce does not teach or disclose the manner in which the various solutions are applied to the porous medium or the sequence in which those solutions are applied. Both of these elements of Applicants' invention are explicitly recited in Applicants' claims and are essential to performance of the assay defined by Applicants' claims.
 
 
 34
 (Emphasis added.) Thus, to distinguish their invention from Pierce, the '288 patent inventors represented that their invention contained strict limitations about the point and manner of "applying" solvent. Extending the "applying" limitation to migration across the reaction zone would conflict with these prosecution representations.
 
 
 35
 Finally, Baxter adduced affidavits by the inventors and two experts about their understanding of the "applying" limitation. For example, inventor Zims states:
 
 
 36
 [Placement of the wash solution on the filter paper in the OPUS assay] results in the substrate migrating through the filter paper and therefore being applied to the center of the reaction zone....
 
 
 37
 (Emphasis added.) Zims states the undisputed fact that in PB's OPUS assay method, the wash solution migrates through the filter paper. From this alone, Zims concludes that this migration across the reaction zone is "applying, to substantially the center of said reaction zone." Zims does not, however, reconcile this interpretation of "applying" with the representations she made to secure the patent. "[A]n inventor may not be heard to proffer an interpretation that would alter the undisputed public record" of the patent and prosecution history. Senmed, Inc. v. Richard-Allan Medical Indus., Inc., 888 F.2d 815, 819 n. 8, 12 USPQ2d 1508, 1512 n. 8 (Fed.Cir.1989). Without support, Zims' conclusory assertion cannot justify construing the limitation more broadly than the patent and prosecution history warrant. See Barmag Barmer Maschinenfabrik AG v. Murata Mach.,Ltd., 731 F.2d 831, 835-36, 221 USPQ 561, 564 (Fed.Cir.1984).
 
 
 38
 The affidavit of Baxter's first expert, Barbeau, is similarly flawed. Like Zims, Barbeau asserts that any "delivery" of eluting solvent to the center of the reaction zone meets the "applying" limitation. Like Zims, Barbeau does not mention the '288 patent specification and prosecution history, much less attempt to reconcile them with this litigation-induced claim interpretation. Baxter cannot invoke Barbeau's unsupported and conclusory assertion to avoid summary judgment. See Barmag, 731 F.2d at 836.
 
 
 39
 Finally, the affidavit of Baxter's other expert, Caldwell, does not even assert that PB's OPUS assay method meets the "applying" limitation. Caldwell asserts instead that "it is insignificant to me whether the substrate is pipetted directly onto the center of the glass fiber filter paper as [claimed in the '288 patent] or enters the glass fiber filter paper through a wash port at one end of the glass fiber filter paper as in OPUS." Caldwell thus expresses his opinion of the scientific significance of the "applying" limitation. But regardless of its scientific significance, the "applying" limitation, like all claim limitations, must be met for PB to literally infringe. Johnston v. IVAC Corp., 885 F.2d 1574, 1577, 12 USPQ2d 1382, 1384 (Fed.Cir.1989). "[S]pecific claim limitations can[not] be ignored as insignificant or immaterial in determining infringement." Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F.2d 1528, 1533 n. 8, 3 USPQ2d 1321, 1325 n. 8 (Fed.Cir.1987).
 
 
 40
 The claim language, specification, and prosecution history require a construction of the "applying" limitation that excludes migration across the reaction zone. The trial court correctly construed the "applying" limitation, and correctly granted summary judgment that PB's OPUS assay method does not literally infringe.
 
 Doctrine of Equivalents
 
 41
 Baxter contends that PB's OPUS assay method infringes under the doctrine of equivalents. To prevail, Baxter must prove that the OPUS method includes an equivalent for the "applying" limitation. ZMI, 844 F.2d at 1582. The doctrine of equivalents cannot apply, however, if the inventors' prosecution arguments estop Baxter from asserting that the OPUS method includes an equivalent for the "applying" limitation. Texas Instruments Inc. v. United States Int'l Trade Comm'n, 988 F.2d 1165, 1173, 26 USPQ2d 1018, 1024 (Fed.Cir.1993). The applicability of prosecution history estoppel is a question of law. Id.
 
 
 42
 In this case, the inventors did not amend the critical "applying" limitation during prosecution. Prosecution history estoppel, however, can still apply. "[A]n estoppel can be created even when the claim, which is the basis for the assertion of infringement under the doctrine of equivalents, was not amended during prosecution." Haynes Int'l, Inc. v. Jessop Steel Co., 8 F.3d 1573, 1579, 28 USPQ2d 1652, 1657 (Fed.Cir.1993), clarified on other grounds, 15 F.3d 1076, 29 USPQ2d 1958 (Fed.Cir.1994). Estoppel may arise solely from prosecution arguments made in support of non-amended claim language. Id.
 
 
 43
 During prosecution, the inventors argued that "the manner in which the various solutions are applied," including the eluting solvent, is "essential to performance of the assay defined by [the] claims." The inventors further argued that the claims "are specific as to the point of application of ... the eluting solvent." These "unmistakable assertions" made during prosecution preclude Baxter from now asserting equivalency, "whether or not required to secure allowance of the claim." See Texas Instruments, 988 F.2d at 1174. The trial court correctly granted summary judgment that PB does not infringe under the doctrine of equivalents.
 
 CONCLUSION
 
 44
 As correctly construed by the trial court, "applying, to substantially the center of said reaction zone" does not extend to migration across the reaction zone as in PB's OPUS assay method. The inventors' prosecution arguments, furthermore, estop Baxter from asserting that such migration is equivalent to the "applying" limitation. The trial court correctly granted summary judgment of noninfringement.
 
 COSTS
 
 45
 Each party shall bear its own costs.